**ATTORNEY REGISTRATION AND DISCIPLINARY COMMISSION OF the SUPREME COURT OF ILLINOIS and Carl H. Rolewick, Administrator, on their own behalf and as trustees on behalf of all employees of the Commission past and present, Plaintiffs,**

v.

**Patricia HARRIS, Secretary of Health and Human Services, Philip J. DiBenedetto, Acting Regional Commissioner for Social Security, and G. William Miller, Secretary of the Treasury, Defendants.**

No. 80 C 3974.

United States District Court,
N.D. Illinois, E.D.

July 6, 1984.

John O'Malley, Chicago, Ill., Rubin G. Cohn, Champaign, Ill., Robert G. Cronson, Richard J. Prendergast, Chicago, Ill., for plaintiffs.

Ed Moran, Asst. U.S. Atty., Chicago, Ill., for defendants.

Samuel W. Witwer, Sr., Witwer, Moran, Burlage & Witmer, Chicago, Ill., for proposed intervenors.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

On July 29, 1980, the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (the "Commission") instituted this action, seeking a declaration that: (i) certain actions taken by defendant Patricia Harris, former Secretary of Health and Human Services (the "Secretary") were arbitrary, capricious, an abuse of discretion and illegal; (ii) the Illinois Supreme Court was not the employer of Commission personnel for Federal Insurance Contribution Act ("FICA") and Federal Unemployment Tax Act ("FUTA") purposes; and (iii) Commission personnel qualify for Social Security coverage. On August 23, 1982 and October 7, 1982, respectively, this Court granted the Secretary's motion to dismiss and denied plaintiffs' motion for reconsideration, holding that that jurisdiction did not exist under either 28 U.S.C. § 1331 (federal question), or 42 U.S.C. § 405(g) (judicial review of final decisions by the Secretary). *Attorney Registration and Disciplinary Commission v. Schweiker*, 545 F.Supp. 1098 (N.D.Ill.1982). On December 29, 1982, this Court also dismissed the Commission's remaining mandamus count. 28 U.S.C. § 1361.

The Commission successfully appealed these rulings. On August 11, 1983, the Seventh Circuit reversed the dismissals, stating:

> The Disciplinary Commission has an interest independent of its employees in knowing whether it has gotten anything for the $180,000 it has contributed to the social security fund. That interest is sufficient to support its own action under 205(g) of the Social Security Act despite the possibility—no more than that—that its employees might be able one by one to obtain a determination of their coverage by proceeding under section 205(c).

*Attorney Registration and Disciplinary Commission v. Schweiker*, 715 F.2d 282, 290 (7th Cir.1983).

The Secretary has answered the complaint and has filed a certified copy of the administrative record, which consists largely of the documents and correspondence summarized below.[1] Robert G. Cronson, the Auditor General of the State of Illinois, was given leave to intervene in this action on February 15, 1984. The Secretary has moved for summary judgment. The Commission has responded with a cross-motion for summary judgment. These are the matters currently before the Court.

**Factual and Procedural Background**

The complex procedural history of this action begins in 1973,[2] shortly after the Illinois Supreme Court created the Commission. Prior to 1973, committees of the Illinois State Bar Association ("ISBA") and the Chicago Bar Association ("CBA") supervised disciplinary procedures brought against Illinois lawyers. Pursuant to Illinois Supreme Court Rules, these committees received complaints, made investigations, filed charges, heard evidence and made recommendations to the Court. Their work was financed by a portion of dues paid by CBA and ISBA members.

During 1973, the Illinois Supreme Court adopted new rules which established the Commission to perform these functions. The Court provided funds for the Commission by requiring all attorneys admitted to practice in Illinois to pay an annual fee. The Commission consists of five members, who along with the Commission's Administrator, are appointed by the Court. Ill.Rev. Stat. ch. 110A, §§ 751 and 752. The Court also appoints the Review Board, which makes final recommendations to the Court as to the sanctions to be imposed by the Court upon attorneys. The Commission or the Administrator appoint the Commission's staff of attorneys, investigators and clerks, *see* §§ 751 and 752, as well as the Inquiry and Hearing Boards, which conduct the initial stages of the disciplinary process. Each year the Commission is required to file a report of its activities with the Supreme Court.

The Commission first sought Social Security coverage for its employees during 1973, by requesting a ruling from the Internal Revenue Service (the "Service") as to its liability for FICA and FUTA taxes on wages paid to its employees. On June 1, 1973, the Service concluded that the services performed by the Commission employees were not within FICA's definition of employment, 26 U.S.C. § 3121(b)(7) (*see also* FUTA, 26 U.S.C. § 3306(c)(7)), basing its conclusion on its view that the Commission was "a wholly owned instrumentality of the State of Illinois." On August 3, 1973 the Secretary notified the Service that she had reviewed the Service's conclusions and agreed.

The Service also referred the Commission to the State Employees Retirement System of Illinois as a source of information on obtaining Social Security coverage for its employees. Since the Service viewed the Commission as a "state agency," the only method by which it would permit the Commission to obtain Social Security coverage for its employees was under the existing "Section 218 agreement" between the State of Illinois and the federal government. To enable state and local government employees to obtain Social Security coverage, a state must agree to pay FICA taxes pursuant to Section 218 of the Social Security Act, 42 U.S.C. § 418. Illinois' Section 218 agreement authorizes Social Security coverage for: (i) employees of the State or its political subdivisions and (ii) employees of instrumentalities of the State. Ill.Rev.Stat. ch. 108½, § 21–119.

Having been informed by the Service that it must proceed within the Illinois Sec-

---

**1.** The administrative record also contains an opinion of the Attorney General of the State of Maryland, concluding that a body similar to the Commission, created by the Maryland courts, is not an independent entity (in accord with the 1974 opinion of the Illinois Attorney General, described below).

**2.** The Chicago Bar Association appeared, as *amicus curiae*, and related the circumstances surrounding the Commission's creation and important current role in the Illinois legal system.

tion 218 agreement, the Commission requested opinions from the Illinois Attorney General and the Illinois Public Employees Pension Laws Commission[3] as to which portion of the Section 218 agreement applied to its employees. On August 25, 1973, the Pension Laws Commission advised that Commission employees would not be able to obtain Social Security coverage as employees of the State because, although "technically employees of the State government," Commission personnel were not paid by the State.

On July 31, 1974 the Illinois Attorney General determined that "the Commission is not an instrumentality of the State of Illinois, as defined in the State's Social Security Enabling Act, ..., but rather that it is an agency of the judicial branch of the State of Illinois." Op.Ill.Att'y Gen. S–793. Thus, Commission personnel were not eligible for coverage under either portion of the Illinois Section 218 agreement.

This unique status resulted from the manner in which the Commission is funded. As noted above, the Supreme Court of Illinois funded the Commission's efforts by requiring all attorneys admitted to practice in Illinois to pay an annual fee to the Commission. These fees are held in a separate trust fund, from which the Commission pays its expenses, including salaries. The Illinois Public Employee Pension Laws Commission, in its 1973 opinion, pointed out

that Commission personnel would become "state employees" if the Commission were to turn over these funds to the State Treasury and allow its employees to be paid by the State. The Commission has vigorously resisted[4] this suggestion.

On January 10, 1975, based on the opinions of the Illinois Attorney General and the Pension Laws Commission to the effect that Commission personnel did not fall within either portion of the Illinois Section 218 agreement, the Commission requested reconsideration of the Service's June 1, 1973 ruling. The Service remained unpersuaded. On May 9, 1975, the Service reaffirmed its earlier ruling that Commission personnel were in the employ of the State of Illinois.

On November 10, 1975, the Commission took a new approach. It filed an application for tax exempt organization status under Illinois Revised Code ("IRC") section 501(c)(6).[5] 26 U.S.C. § 501(c)(6). As exhibits to its application, the Commission attached the Service's 1973 and 1975 rulings and the Illinois Attorney General's opinion. The application contained the following two questions: "Are you now or do you plan to be connected in any way with any other organization?" "Are you under the supervisory jurisdiction of any public regulatory body, such as the Social Welfare Agency, Board of Regents, etc.?" The Commission responded to both questions in the nega-

---

**3.** This request was made through State Representative J. David Jones.

**4.** The Commission's resistance has not been undertaken solely on its own initiative or merely to assure its continued control over its own budget. The organized bar supports the Commission, as does, apparently, the Illinois Supreme Court. The Auditor General maintains that the attorney registration fees are "public funds," subject to audit by his office, while the Commission maintains that such an audit would violate the separation of powers provision of the Illinois Constitution.

In a further effort to bring the Commission funds within his audit authority, Auditor General Cronson filed a petition before the Illinois Supreme Court seeking to mandamus the Commission's Administrator. *Cronson v. Attorney Registration and Disciplinary Commission,* No. 57179, (Ill.Sup.Ct. filed Aug. 23, 1982). The

Court denied Cronson's petition on March 13, 1984.

In Support of the Commission, the CBA has filed an action in the Circuit Court of Cook County, Illinois seeking a declaration that Commission funds are not subject to audit by Auditor General Cronson. *CBA v. Cronson,* 82 L 50131 (Cir.Ct. Cook filed July 28, 1982). That action is pending.

This Court does not intend by this ruling to express any opinion concerning the merits of the Auditor's right to audit Commission funds. That is a question of state law which will be resolved in the pending Circuit Court proceeding.

**5.** Section 501(c)(6) exempts from income tax "Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues, not organized for profit ...."

tive. The Secretary now disputes the correctness of these responses, in light of the Commission's relationship with the Illinois Supreme Court.

On January 29, 1976, the Service approved the Commission's applications in a form letter containing the following provisos.

Based on the information supplied, and assuming you operations will be as stated in your application for recognition of exemption, we have determined that you are exempt from Federal income tax provisions . . .

Unless specifically excepted you are liable for taxes under the Federal Insurance Contributions Act (social security taxes) . . . .

In response to this ruling, the Commission arranged for payment of FICA and FUTA taxes for the prior periods of 1973, 1974 and 1975, with interest, but without penalty. On March 26, 1976 the Commission forwarded its payments for prior years to the Service. In May of 1976, the Service notified the Commission of the amount of interest due, and the Commission paid these amounts on June 15, 1976. The Commission continued to make payments of FICA and FUTA taxes quarterly as they became due.

As noted above, Auditor General Cronson unsuccessfully attempted to audit Commission funds beginning in 1976 and 1977. On July 12, 1979, Cronson contacted the Service, seeking information as to the Commission's section 501(c)(6) status. Cronson asked the Service to explain the apparent reversal of its 1973 and 1975 rulings by assessing FICA and FUTA taxes. By letter dated July 31, 1979, the Service replied that no express reversal was on file. Cronson then requested that the Service review the Commission's section 501(c)(6) status, noting the Commission's status as an agency of the Illinois Supreme Court. On August 28, 1979, the Service denied Cronson's request, pointing out that only the Commis-

sion could initiate a review of its section 501(c)(6) status.

The Service also referred Cronson's request to its Chicago regional office for an investigation as to whether the Commission had inaccurately represented to the Service its relation to the Illinois Courts. Counsel for the Auditor General pursued the Commission's status before the Service's Chicago office. At this same point in time, the Commission's sister agency, the State Board of Law Examiners, followed the Commission's example, obtaining a favorable ruling from the Service as to its section 501(c)(6) status on December 10, 1979.

The administrative record does not reveal how the Secretary became aware of the correspondence between Cronson and the Service regarding the Commission's FICA and FUTA tax payments. However, an interoffice memorandum dated January 24, 1980 asks that the Service be advised that it should cancel the Commission's prior wage reports and discontinue further processing of wage reports. During late January and early February of 1980, the Secretary's Chicago regional office investigated the status of both the Law Examiners and the Commission. On February 8, 1980, the Secretary's Regional Commissioner notified both the Law Examiner and the Commission that the Service's determination of their section 501(c)(6) status had no effect on their Social Security wage status and that the Service had been directed not to process further FICA and FUTA wage reports.

As to the Commission, the Secretary's Chicago office further advised that all prior wage reports still subject to correction would be cancelled. The Regional Commissioner conceded that the "erroneous reporting [by the Commission] may have been made in reliance on a favorable ruling by the IRS under Section 501(c)(6)." Nonetheless, the Secretary cancelled all prior wage reports for periods after January 1, 1976 without further consideration of the effect of such action.[6]

6. The Secretary's action was stayed by agreement of the parties to maintain the status quo during the pendency of this action.

During March of 1980, the Commission met with Social Security representatives and submitted additional information in an attempt to convince the Secretary that Commission personnel should be provided with Social Security coverage. The Secretary's Regional Commissioner denied the Commission's request for reconsideration on July 10, 1980, advising the Commission that it had no formal appeal rights.

## Discussion

■ The parties agree that the scope of this Court's review is limited to a determination of whether the Secretary's decision is supported by substantial evidence in the administrative record as a whole.[7] *See Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir.1982). Applying this standard to the administrative record, the Court must affirm the Secretary's findings that: (i) the Service's 1973 and 1975 rulings regarding FICA and FUTA taxes were not inconsistent with the Service's 1976 ruling as to tax exempt status under IRC § 506(c)(6); (ii) Commission personnel would be eligible for social security coverage only under Illinois' Section 218 agreement; and (iii) the Service should be advised not to process further wage reports filed by the Commission.

■ The 1974 opinion of the Illinois Attorney General (in accord with an opinion of Maryland's Attorney General) as well as those of the Internal Revenue Service and the Illinois Public Employee Pension Laws Commission, provide substantial evidence upon which the Secretary could have based these decisions. This evidence indicates that the Commission is an agency of the Supreme Court of Illinois and not a separate entity. Therefore, Social Security coverage for Commission personnel must be obtained, if at all, through the Illinois Section 218 agreement. Whether Commission personnel qualify under the terms of that agreement, and if so, whether as employees of a "political instrumentality" or of the State, is a matter of Illinois law not to be decided by the Secretary or this Court.

The Commission's arguments to the contrary may be summarized as asserting the Commission's autonomy from the Illinois Supreme Court. Typical of these arguments are the Commission's contentions regarding payment of salaries to its personnel. The Commission contends that its personnel are employees of the Commission and not of the Illinois Supreme Court because they are paid from "the Commission's funds," rather than from the State Treasury, in accordance with a pay structure set by the Commission, rather than the Court. The evidence of record is inconsistent with this contention, as well as all other "autonomy" arguments advanced by the Commission. The Illinois Supreme Court did not sever all ties with the Commission immediately after its creation of that entity. While the Commission has been delegated control over its own day to day operations, including the setting of a pay structure, the Court retains control over the Commission. The Commission must account to the Court annually as to its activities, its receipts and its expenditures, including salaries paid. The fund which the Commission "collects and administers" is in no sense its own, but rather the Court's. By contnding that the fund is its own, the Commission simply assumes the conclusion of its argument; that it is autonomous.

As the Secretary correctly points out, the Illinois Supreme Court has repeatedly held that the Commission acts only as its delegate to exercise the *Court's* inherent powers "to discipline attorneys who have been admitted to practice before it." *In re Mitan*, 75 Ill.2d 118, 25 Ill.Dec. 622, 387 N.E.2d 278, 280, *cert. denied sub nom; Mitan v. Attorney Registration and Disciplinary Commission*, 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979). *See also Hoover v. Ronwin*, —— U.S. ——, ——, 104 S.Ct. 1989, 1998, 80 L.Ed.2d 590, 52 U.S. L.W. 4335, 4539 (May 15, 1984) (conduct of Arizona Committee on Examinations and

---

7. The Court therefore applies this standard without examining whether the "substantial evidence" test or the less stringent "arbitrary and capricious" test applies. *See* 5 U.S.C. § 706(2)(A) & (E) and 28 U.S.C. § 408(g).

Admissions is "in reality that of the Arizona Supreme Court," therefore, immune from attack under the federal antitrust laws). Thus, the Secretary's findings listed above are not only supported by substantial record evidence, but are supported by all of the record evidence.

■ Nonetheless, the Secretary's February 8, 1980 decision included one additional finding which is totally unsupported by the record; the finding that all wage reports still subject to correction should be cancelled. The Secretary's decision to apply her other findings retroactively rather than prospectively is distinct from her findings as to the Commission's status. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *See also NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 757 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981) (applying *Chevron Oil* to a decision by an administrative agency). As such, it must be supported by consideration of the additional factors bearing on the issue of retroactive application, for example, the equities involved. "Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem." *Motor Vehicle v. State Farm Mutual Automobile Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Failure to give any consideration to the hardships that may be imposed on Commission personnel as a result of striking several years of wage reports renders the Secretary's action arbitrary and capricious. *International Ladies' Garment Union v. Donovan,* 722 F.2d 795, 812–18 (D.C.Cir.1983); *People of the State of Illinois v. United States,* 666 F.2d 1066, 1077 (7th Cir.1982) (failure to respond to an important argument raised before agency constitutes error requiring remand).

A comparison of the Secretary's letter to the Commission with her letter to the Law Examiners illustrates the point. As of February 8, 1980, the Law Examiners had

made no contributions for FICA or FUTA taxes, since they had only recently received their favorable section 506(c)(6) ruling from the Service. On the other hand, the Commission (and Commission personnel) had been making Social Security contributions for a period of seven years. Yet, without any additional inquiry into the impact of such a decision on Commission personnel, the Secretary extinguished this seven year contribution history.

The Secretary correctly points out that the Commission cannot sustain a claim of equitable estoppel against the government, *see Portmann v. United States,* 674 F.2d 1155 (7th Cir.1982), because it was informed on several occasions that the proper method of obtaining Social Security coverage was through the Illinois Section 218 agreement. However, the equities are quite different with regard to Commission personnel, who were in all likelihood told little beyond the fact that Social Security coverage had become available. It is possible that some reasonably relied upon the availability of Social Security coverage in remaining with or coming to work for the Commission. While striking the contribution records and refunding with interest contributions paid [8] may be acceptable to some Commission personnel, others may suffer a hardship from such action. They may have depended upon these contribution periods to accumulate the minimum contribution history needed to qualify for Social Security benefits and may now be unable to reaccumulate a sufficient number of contribution periods to qualify for such benefits. *See* 42 U.S.C. § 414(a). The administrative record is barren of any consideration of these important aspects of the problem of retroactivity. Therefore, the Secretary's decision to strike the wage reports of all Commission personnel must be vacated.

This action is remanded to the Secretary for further consideration of whether it is appropriate to retroactively strike the

---

**8.** The Secretary has not argued, nor could she with any support, that after striking these contribution records the government could refuse a

full refund with interest of contributions made by the Commission or Commission personnel.

FICA wage reports of individual Commission personnel and refund their contributions with interest. Further, if refund be ordered, the date of such refunds and the amount due the Commission and the individuals should be determined. It is requested that the Secretary act within 180 days.

IT IS THEREFORE ORDERED that

(1) The Secretary's decision that personnel of the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois are not eligible for Social Security coverage, consistent with the 1973 and 1975 rulings of the Internal Revenue Service, is affirmed.

(2) The Secretary's decision to instruct the Internal Revenue Service not to process further wage reports submitted by the Commission is affirmed.

(3) The Secretary's decision to strike all wage reports previously filed by the Commission is vacated.

(4) This action is remanded to the Secretary for further consideration.

(5) The Commission's claim for mandamus relief is dismissed as moot.

(6) The stay heretofore entered shall continue pending further action, subject to a motion to vacate should the matter be resolved by settlement.